## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **MELISSA GONZALES-SILAS,** | § | |
| | § | |
| **Complainant,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **JANET YELLEN, AS SECRETARY** | § | **Civil Action No. 4:22-cv-1055** |
| **OF THE UNITED STATES DEP'T** | § | |
| **OF THE TREASURY, BUREAU** | § | |
| **OF ENGRAVING AND PRINTING,** | § | |
| | | |
| **Defendant.** | | |

---

### PLAINTIFF'S ORIGINAL COMPLAINT

---

**NOW COMES** Plaintiff, Melissa Gonzales-Silas, complaining of Defendant, Janet Yellen in her official capacity as Secretary of the United States Dep't of the Treasury, Bureau of Engraving and Printing, and for cause of action would show the Court the following:

### PARTIES

1.      This Complaint is filed by Melissa Gonzales-Silas, Plaintiff, whose address is 4656 Rockmill Trail, Fort Worth, Texas 76179.

2.      Defendant, Janet Yellen as Secretary of the United States Dep't of the Treasury, Bureau of Engraving and Printing, and the agency head for all bureaus and entities within the Department of the Treasury. Service of process may be had at 1500 Pennsylvania Avenue NW, Washington, DC 20220.

### JURISDICTION & VENUE

3.      Jurisdiction is proper in this Court because this case has federal question

jurisdiction over civil rights matters under 28 U.S.C. §§ 1441, 1443, and 1446. Plaintiff's claims arise under Title VII of the Civil Rights Act of 1964.

4.      Venue lies in the Northern District of Texas, Fort Worth Division, under 28 U.S.C. §§ 1441(a) and 1446(a) because Plaintiff filed the State Court Action in this judicial district and division.

## FACTS

5.      On or about November 10, 2012, at a Senior Leadership Course in Fort Devens, Massachusetts, a flash grenade was thrown into the training warehouse and exploded less than ten feet from where Plaintiff was standing.

6.      Since being subjected to that flash grenade detonation, Plaintiff has been plagued by many medical conditions as a result of the explosion and has been diagnosed with multiple major disorders. None of these diagnoses were present prior to that incident involving the grenade on November 10, 2012. The most current diagnoses include (i) a brain concussion/personal history of brain injury diagnosis dated August 27, 2019; (ii) panic and anxiety attacks dated April 7, 2017; and (iii) insomnia diagnosis dated August 8, 2019.

7.      After applying for a Product Security Position with the Bureau of Engraving and Printing, in August of 2015, Plaintiff was required to attend a required Basic Investigator Training Course at the Federal Law Enforcement Training Center in Glynco, Georgia. On or about August 18, 2015, while attending that training, Plaintiff was running to the bus to get to her next class when she felt a loud, hard pop in her right knee and was diagnosed with a 'sprain of unspecified sites' in her knee and leg and a 'tear in the medial meniscus of her knee and her right chondromalacia patellae'. Plaintiff was then required to return to the Western Currency Facility in Fort Worth, Texas and was unable to finish the course at that time.

8.      On or about October 30, 2015, Plaintiff was terminated for not completing the course, despite not being provided an opportunity to return to the training facility and/or receive a waiver regarding the physical requirements, or receive a different position that did not require the basic investigator training course; all of which accommodations were routinely provided to other similarly situated employees.

9.      On or about November 10, 2015, Plaintiff had surgery to correct her knee issues.

10.     Plaintiff filed an EEOC claim against Defendant under Docket DA-3443-16-0074-I-1. On or about November 6, 2019, Plaintiff successfully reached a settlement with Defendant, wherein Plaintiff accepted a different position with the Physical Security Division.

11.     Unfortunately, when Defendant reinstated Plaintiff as an employee, Defendant almost immediately began discriminating against her.

12.     On or about April 29, 2020, Kathy Cortez emailed Michael Armstead, Plaintiff's supervisor, and advised that she was going to have Plaintiff take over management of the drug program for WCF.

13.     In May and June of 2020, Michael Armstead sent emails regarding the benefits of telework and referencing it would be approved on a case-by-case basis except when driven by unforeseen circumstances. Michael Armstead specifically stated that he 'wasn't telling anyone they couldn't telework, he just wanted to make sure there were resources in the office as well'.

14.     On or about August 4, 2020, Plaintiff submitted a Reasonable Accommodation Request Form.

15.     On or about August 18, 2020, Plaintiff requested to telework for her first New Employee Orientation to help control her anxiety and panic attacks. Michael Armstead refused to grant her request, despite her documented medical history and diagnoses.

16.     On or about August 21, 2020, Michael Armstead called Plaintiff into his office and grilled her about her need for reasonable accommodations. Michael Armstead was aware of her request and Plaintiff has a well-documented history of her disabilities, especially since they were sustained while on the job with the federal government. Michael Armstead then confronted Plaintiff about a new FRV camera placement project that left Plaintiff in tears and visibly shaken. Michael Armstead even insisted that he was "documenting" this meeting. Plaintiff felt threatened and unsafe in this meeting due to Michael Armstead's demeanor and conduct.

17.     On or about November 9, 2020, Plaintiff asked to have her telework day on a different day since her current day fell on Veteran's Day. Notably, Plaintiffs colleagues were not working on Veteran's Day and still maintaining a telework day on a different day of the week. Michael Armstead refused Plaintiffs simple request.

18.     As the weeks continued, the teleworking schedule would show everyone working at least their scheduled telework days plus additional telework days, but Plaintiff would have weeks and/or pay periods where she didn't even get to take her regular teleworking days and certainly no additional days.

19.     On or about November 23, 2020, Plaintiff had a conversation with colleague Enid Brechbiel wherein Ms. Brechbiel disclosed that she was not working her scheduled telework day but a different day that was approved by Michael Armstead. At this point, Michael Armstead had refused all requests for such accommodation by Plaintiff. When Plaintiff followed up that day to request a telework day, Michael Armstead began to question what work Plaintiff had to telework which is not the inquiry he would make when other colleagues made such requests.

20.    On or about December 16, 2020, Michael Armstead sent out an email outlining generalized duty branch responsibilities. Plaintiff was given the most responsibilities in her department.

21.    On or about December 23, 2020, Michael Armstead began texting Plaintiff asking her if she was coming in that day. That was her telework day and he knew that since he was the one that prepared and disbursed the schedules. Plaintiff let him know about her network issues and physical issues she had experienced the day prior. Michael Armstead asked for a plan and Plaintiff noted that if she couldn't get her network issues working then she would have to request leave. Michael Armstead then chastised Plaintiff for not speaking to him about leave the previous day at which point Plaintiff noted that she had let others know because he had been out the previous day and she believed he was still out of the office.

22.    On or about January 11, 2021, Michael Armstead emailed Plaintiff about an AWOL Charge Notice and notified her that she had two days to respond. This AWOL charge was instigated by Michael Armstead against Plaintiff because he alleged she had not followed the proper protocols for time off.

23.    On or about February 16, 2021, Plaintiff was hospitalized for high blood pressure and a high heart rate that could not be controlled. She was also suffering from anxiety and panic attacks. Michael Armstead did not send any condolence messages or check on her.

24.    On or about March 12, 2021, Michael Armstead sent Plaintiff a confrontational email requesting a status on certain work that needed to be completed and accusing Plaintiff of not doing her job. Plaintiff eventually had to send him an email receipt to prove that she had indeed sent the work the night before. Michael Armstead was not treating Plaintiff's co-workers this way.

25.     On or about March 19, 2021, Paula Rathers, EEO/ADR Specialist, emailed Plaintiff that Michael Armstead had reached out to them about some reasonable accommodations. This is months after Plaintiff had initially requested some reasonable accommodations, most specifically the telework that was summarily denied by Michael Armstead.

26.     On or about March 24, 2021, Michael Armstead sent an email that he intended to start having weekly meetings with Plaintiff, coincidentally on her teleworking day, to go over all her tasks and get updates. Michael Armstead does NOT do this with Plaintiff's colleagues.

27.     On or about April 9, 2021, Plaintiff submitted another Reasonable Accommodation Request Form.

28.     On or about April 12, 2021, Michael Armstead emailed Plaintiff to say he received the reasonable accommodation request but it was too late to adjust her schedule. Once again refusing to accommodate her even though he was required to do so by the government. Michael Armstead further advised Plaintiff he was going to get with legal counsel to determine what other documentation he would request from her before making a final decision.

29.     Later that night Michael Armstead texted Plaintiff to say that the answer is never to go ahead and take her telework day, but always if she is going to be out she needs to take leave.

30.     On or about April 13, 2021, Plaintiff had to take leave to be with her mother in the hospital as Michael Armstead would not approve any telework.

31.     Telework pay period 5 for February 28, 2021-March 13, 2021 had four hours of telework for Plaintiff while her colleagues all had sixteen.

32.     Telework pay period 6 for March 14, 2021-March 27, 2021 had eight hours of telework for Plaintiff while her other colleagues ranged between fourteen and thirty-three hours. Plaintiff's colleague Michael Williams was even offered telework when he was out for medical

reasons which is in direct opposition to Michael Armstead direction to Plaintiff that the answer is never telework but instead to take leave.

33.     On or about April 20, 2021, Michael Armstead again requested Plaintiff come into work the next day on her telework day.

34.     On or about April 21, 2021, after Michael Armstead said he would allow her to go home midmorning on her telework day that he insisted she come into work, he asked if she was going to be taking leave to go back home.

35.     On May 12, 2021, Michael Armstead chose to conduct Plaintiff's mid-year review in the atrium where no less than twenty people walked by while Michael Armstead criticized Plaintiff and her work performance. Michael Armstead purportedly did this so Plaintiff wouldn't be uncomfortable alone with him in his office, but instead of finding an open, private place he chose to humiliate Plaintiff in front of any passing colleagues. Plaintiff counted at least twenty colleagues pass by her during that review. Plaintiff had to leave to compose herself in the restroom as she was humiliated and crying.

36.     On or about May 25, 2021, EEO Counselor Lynette Taylor contacted Plaintiff to set up a meeting to discuss her request for reasonable accommodation. In this exchange, Plaintiff let Lynette Taylor know that she felt she was being harassed by Michael Armstead.

37.     On or about June 2, 2021, Michael Armstead asked Plaintiff if she was still moving forward with a reasonable accommodation request because he could offer her nothing until that process ran its course. Plaintiff responded that she had submitted the requested medical information and was indeed waiting on the process.

38.     On or about June 22, 2021, Michael Armstead emailed Plaintiff that she had not been approved for telework so she was required to come into the office and if she could not then

she would need to request sick leave. He also indicated they would discuss her medical documentation with the Office of Equal Opportunity and Diversity Management when she came in. Plaintiff's colleagues had all been approved for their telework days and even additional telework time upon request.

39.    On or about June 23, 2021, Plaintiff requested leave for physical pain issues. Michael Armstead attempted to guilt Plaintiff telling her that she was putting him in a difficult position and eventually approved one day but not the other.

40.    On or about June 29, 2021, Plaintiff submitted a letter from Department of Veterans Affairs physician Xue-Liu MD for review for her accommodation request.

41.    On or about June 30, 2021, the Reasonable Accommodation Request Decision was submitted with returned signed forms from Dr. Badylak for hip surgery.

42.    On or about July 7, 2021, Plaintiff emailed that Michael Armstead was continuing to add stress to her already panicked state because he was harassing her by bringing up old requests that were already closed or settled, requesting the same paperwork multiple times and then continually harassing her about getting it returned when the surgeon hasn't had the proper time to fill it out and return (AGAIN), and denying requests that were already approved. She wanted all this added to her EEO complaint.

43.    On or about July 8, 2021, Plaintiff completed her FMLA paperwork. Plaintiff had to take leave before her surgery because Michael Armstead refused to allow a telework accommodation.

44.    Michael Armstead knows he has a poor relationship with Plaintiff. A relationship in which she feels she is harassed by him and treated differently due to her disability. Michael Armstead has never shown any care or concern for Plaintiff's well-being, fighting her every inch

of the way in her requests for accommodations and her everyday work activities, and harassing her about her requests for accommodations or leave.

45. On or about July 11, 2021, Michael Armstead continued to inflict further harassment under the guise of texting her about her upcoming surgery. He had shown no care about this in the weeks leading up to the surgery and he knew that interactions with him were harmful to Plaintiff due to her disabilities. This text only added to and worsened Plaintiff's anxiety.

46. Plaintiff then emailed the EEO office to report this behavior and request that when she came back to work after her surgery that she be placed in a different department.

47. On or about August 13, 2021, an informal mediation was held, and Plaintiff was forced to be in the same space as Michael Armstead despite the fact that the EEO knows that he is harassing her and causing her increased anxiety and panic attacks. It was physically taxing on Plaintiff and took a toll on her mental health.

## CAUSE OF ACTION I
## DISCRIMINATION BASED ON DISABILITY

48. Plaintiff incorporates all preceding paragraphs herein as if set forth at length.

49. Disability discrimination occurs when an employer or entity covered by the American with Disabilities Act ("ADA") treats a qualified individual who is an employee unfavorably because she has a disability. To state a claim for disability discrimination under the ADA, a plaintiff must show: "(1) that [s]he has a disability; (2) that [s]he was qualified for the job; [and] (3) that [s]he was subject to an adverse employment decision on account of [her] disability." *Moss v. Harris County Constable Precinct One*, 851 F.3d 413, 417 (5th Cir. 2017).

50. A disability is "[a] physical or mental impairment that substantially limits one or more of the major life activities of such individual." *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 222 (5th Cir. 2011) (quoting 29 C.F.R. § 1630.2(g)). Under the ADA, diabetes qualifies as a

disability if it substantially limits one or more major life activity or that the plaintiff has a "record" of the diabetes. See *Hearne v. AmWest Sav. Ass'n*, 951 S.W.2d 950, 953 (Tex. App.—Fort Worth 1997). Although having a substantially limiting impairment "is not meant to be a demanding standard[,] . . . not every impairment will constitute a disability within the meaning of [the ADA]." 29 C.F.R. §1630.2(j)(1)(ii).

51.     Indeed, even under the 2008 amendments to the ADA, a physical or mental impairment is a disability only if it "'substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.'" *Estes v. Town*, 2018 WL 1157787, *2 (N.D. Tex. Feb. 7, 2018) (quoting 29 C.F.R. § 1630.2(j)(1)(ii)) (emphasis added); *Walter v. Birdville Indep. Sch. Dist.*, 2018 WL 3974714, *3 (N.D. Tex. Aug. 20, 2018) (same); *Williams v. City of Richardson*, 2017 WL 4404461, *7 (N.D. Tex. Sept. 8, 2017) (same), *report and recommendation adopted*, WL 4351535 (N.D. Tex. Sept. 30, 2017).

52.     Plaintiff is a female with well-documented disabilities. Plaintiff has documented mental disabilities since she endured a brain injury after a flash grenade was detonated approximately ten feet from her person while undergoing government authorized and supervised training. That brain injury led to anxiety disorders, panic attacks, and insomnia, to name a few. In addition, she was also injured at another government authorized and supervised training program that left her physically disabled with knee injuries that required surgery. When Plaintiff's anxiety and panic attacks take hold of her brain, she cannot complete everyday functions like driving or performing her job at work, she can't even take regular breaths, she is simply reduced to crying. In accordance with the ADA standard, Plaintiff did in fact have a disability.

53.     Plaintiff was qualified for her position. Plaintiff was offered her position in 2019 and was even recommended to take over control of a specific drug program in 2020. It is not likely

that an employee would be recommended to head up a program if they were not qualified to do so. It is also unlikely that an employee would be retained on a job for years if they were not qualified to handle that position. In fact, on or about December 16, 2020, Michael Armstead sent out an email outlining generalized duty branch responsibilities. Plaintiff was given the most responsibilities in her department. It is illogical to assume a supervisor would task the bulk of a department's responsibilities on an individual that was not qualified for her job. Other than disagreements between Plaintiff and her supervisor over accommodations and absences due to her disabilities, there is zero indication that Plaintiff was not qualified for her position.

54.    Plaintiff has a history of mental disability stemming from 2012. Plaintiff accepted her employment position under Michael Armstead's supervision while suffering from the effects of her mental disability. Michael Armstead was aware of this mental disability. Plaintiff has continually suffered adverse employment action each time Michael Armstead denied Plaintiff's reasonable requests for accommodations for her mental disability even when she has the medical documentation to support such accommodations. Michael Armstead has continually denied requests for Plaintiff to complete her work through telework instead of in-person while such requests from those without disabilities were accommodated. In fact, Michael Armstead told Plaintiff that telework was not appropriate and instead she needed to take leave.

55.    Plaintiff was subject to further adverse employment action when Michael Armstead filed a complaint to accuse Plaintiff of going AWOL because he denied her an accommodation for her disability, and she was unable to come into work. An AWOL complaint is a formal complaint with very important and potentially career-ending consequences levied against Plaintiff because Michael Armstead refused to grant Plaintiff the accommodations that are freely and willingly granted to Plaintiff's colleagues without disabilities. Michael Armstead does not deny Plaintiff's colleagues

leave or accuse them of going AWOL when they need time off for their disability, but he does with Plaintiff. Plaintiff became a target for Michael Armstead due to her disabilities until she could not stand it anymore and she was constructively terminated.

56.    Defendant's actions clearly demonstrate discriminatory conduct towards Plaintiff because of her disabilities.

## CAUSE OF ACTION II
## FAILURE TO PROVIDE A REASONABLE ACCOMMODATION

57.    Plaintiff incorporates all preceding paragraphs herein.

58.    The Agency is required to reasonably accommodate the known limitations of a qualified individual with a disability, unless it can show that doing so would cause an undue hardship to its operations. *See* 29 U.S.C. § 791(f); 42 U.S.C. § 12112(5)(A); 29 C.F.R. §§ 1630.2(o) and (p). To prevail on a reasonable accommodation claim, Complainant must show that: (1) they have a disability; (2) they are qualified for their position; and (3) the Agency failed to provide an effective reasonable accommodation.

59.    A disability is "a physical or mental impairment that substantially limits one or more…major life activities." 42 U.S.C. § 12102(2)(A). An individual is qualified if they "with or without reasonable accommodation, can perform the essential functions of the employment position that [they] hold or desire." 42 U.S.C. § 12111(8). And reasonable accommodation includes modifications or adjustments to the work environment, or to the manner or circumstance under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position. 29 C.F.R. § 1630.2(o)(1)(ii).

60.    As stated above, Plaintiff is a female with well-documented disabilities. Plaintiff has documented mental disabilities since she endured a brain injury after a flash grenade was

detonated approximately ten feet from her person while undergoing government authorized and supervised training. That brain injury led to anxiety disorders, panic attacks, and insomnia, to name a few. In addition, she was also injured at another government authorized and supervised training program that left her physically disabled with knee injuries that required surgery. When Plaintiff's anxiety and panic attacks take hold of her brain, she cannot complete everyday functions like driving or performing her job at work, she can't even take regular breaths, she is simply reduced to crying. In accordance with the ADA standard, Plaintiff did in fact have a disability.

61.    Also as stated above, Plaintiff was qualified for her position. Plaintiff was offered her position in 2019 and was even recommended to take over control of a specific drug program in 2020. It is not likely that an employee would be recommended to head up a program if they were not qualified to do so. It is also unlikely that an employee would be retained on a job for years if they were not qualified to handle that position. In fact, on or about December 16, 2020, Michael Armstead sent out an email outlining generalized duty branch responsibilities. Plaintiff was given the most responsibilities in her department. It seems highly unlikely that a supervisor would put the most departmental responsibilities on an individual that was not qualified for her job. Other than disagreements between Plaintiff and her supervisor over accommodations and absences due to her disabilities, there is no indication that Plaintiff was not qualified for her position.

62.    Plaintiff requested a 4-10 work schedule as a reasonable accommodation due to her mental disability. Michael Armstead and the EEO requested documentation from her doctor, which was provided on more than one occasion, to substantiate the need for this accommodation. Plaintiff's doctor provided a scientific explanation of Plaintiff's injuries and that this would be a reasonable accommodation and more conducive to Plaintiff's health. The Medical Documentation

Request Form submitted by Plaintiff's doctor on November 9, 2021 explains that "the request of dramatically changing her sleep pattern from working a day shift to working a night shift for a week out of every other month is detrimental to her ability to control and function on an alternative sleep schedule." Michael Armstead then took it upon himself to refuse the accommodation without any sound or reasonable explanation. Michael Armstead took it upon himself to refute not just a medical doctor who has the actual skills, training, and knowledge to be able to make these determinations, but he specifically refuted Plaintiff's treating physician who has the most history with Plaintiff and her medical conditions in addition to his general skills, training, and knowledge. Michael Armstead has not provided any sort of healthcare credentials that would support subverting Plaintiff's doctor's reasoning and recommendation. Michael Armstead did not provide any explanation as to why such accommodation would be an undue hardship.

63.     Further, the denial of telework as a reasonable accommodation was just another in a long line of denials for telework for Plaintiff by Michael Armstead. Michael Armstead has allowed telework for her colleague Michael Williams for medical reasons and not required him to take leave. Michael Williams' duties are significantly analogous to Plaintiff's duties. Michael Armstead flatly refused her telework request, instead saying she could come to work with a motor scooter. A general motor scooter would not allow an individual's knee to be elevated while healing after surgery. Her knee would maintain a bent position which is not conducive to healing. Nor would it allow her hip to heal properly. Sitting for long periods is NOT conducive to healing after a hip operation. Patients are up and moving quickly after such a procedure and have to endure substantial physical therapy; sitting all day is detrimental to the healing process. Sedentary work restrictions, as required by Plaintiff's doctor after her surgery, does not mean confined to a chair. That's not an accommodation. Michael Armstead could have offered Plaintiff more telework days

or offered an accommodation that allowed her knee/leg to be elevated and as she worked toward healing. He did not. Like her request for a 4-10 work schedule, he seemed to substitute his judgment for that of medical professionals even though this is a medical issue. Simply requesting additional documentation from Plaintiff's doctor, just like for the 4-10 work schedule, would provide the necessary information to properly accommodate Plaintiff in this situation; reasonable accommodations to which she is legally entitled. Michael Armstead did not provide any explanation to explain why such accommodation would be an undue hardship. Michael Armstead did not even try to provide a reasonable accommodation to Plaintiff but instead fought the process the whole way.

64.     Defendant's actions clearly demonstrate a failure and a refusal to provide Plaintiff with a reasonable accommodation for her disabilities.

**CAUSE OF ACTION III**
**TITLE VII VIOLATION FOR RETALIATION**

65.     Plaintiff incorporates all preceding paragraphs herein.

66.     Title VII of the Civil Rights Act of 1964 (the "Act") prohibits retaliation against an employee who reports discrimination based on disability. It is unlawful to retaliate against applicants or employees for communicating with a supervisor or manager about employment discrimination, including harassment. Retaliation can take the form of a reprimand; giving a performance evaluation that is lower than it should be; engaging in physical or verbal abuse; increased scrutiny; and making the employee's work more difficult.

67.     A plaintiff establishes a claim for retaliation when [s]he, "engaged in an activity protected by Title VII; 2) was subjected to an adverse employment action; and 3) a causal link exists between the protected activity and the adverse employment action." *Adams v. Vaughn*, No. 3:18-CV-1109-B-BT, 2019 WL 1003845, at *3 (N.D. Tex. Feb. 12, 2019)(quoting *Wright v.*

*Chevron Philips Chem. Co.*, 734 F. App'x 931, 935 (5th Cir. 2018)(per curiam)). Protected activity includes complaining to supervisors about acts of unlawful discrimination. 42 U.S.C. §2000e-3(a); *Valdarez v. Lubbock Cty. Hosp. Dist.*, 611 Fed. Appx. 816, 820-21 (5th Cir. 2015)(finding that the plaintiff's report of sexual harassment to his supervisor was protected activity).

68.     Plaintiff engaged in a Title VII protected activity when she began to file complaints against Michael Armstead due to his harassing and discriminatory behavior. Every time Michael Armstead took further discriminatory action, whether it was denying a request for a reasonable accommodation, granting privileges to Plaintiff's colleagues without disabilities that he denied to Plaintiff, etc., she would add that information to her complaint.

69.     A causal link exists between Plaintiff's report to Defendant regarding Michael Armstead's behavior toward her and the worsening of Michael Armstead's behavior. Plaintiff was more than qualified for her position in that she was recommended to take over control of a specific drug program in 2020. In December 2020 Michael Armstead sent out an email outlining generalized duty branch responsibilities which gave Plaintiff the most responsibilities in her department. Once Plaintiff began to make requests for reasonable accommodations, including her 4-10 schedule and increased telework to accommodate her disabilities, Michael Armstead began to increasingly target Plaintiff including bringing her into his office to overly critique her performance, or take her into a public atrium for a performance review and chastise Plaintiff in front of all her passing colleagues, refuse to allow telework and instead require Plaintiff to take leave while at the same time granting telework to her colleagues, requiring Plaintiff to come into the office on days that she actually was approved for telework, filing a report accusing Plaintiff of going AWOL when she was not AWOL and he knew the circumstances, and sending unwelcomed text messages to Plaintiff outside of work. Michael Armstead knew that his presence could trigger

a panic attack for Plaintiff, and he had the audacity to text her the night before major surgery which had the desired triggering effect. He sent the text under the guise of inquiring about her health, but in all their time working together Michael Armstead had never shown any true care for Plaintiff's health. The more Plaintiff complained about Michael Armstead's behavior and his refusal to provide reasonable accommodations for her disabilities, the worse his behavior became until Plaintiff was constructively terminated.

70.    Defendant's actions clearly demonstrate retaliation against Plaintiff for filing complaints against Michael Armstead.

## CAUSE OF ACTION IV
## HOSTILE WORK ENVIRONMENT

71.    Plaintiff incorporates all preceding paragraphs herein.

72.    A plaintiff establishes a claim for hostile work environment under Title VII when she pleads facts that an inference can be drawn that she was subjected to unwelcome harassment because of her protected activity; that the harassment "complained of affected a term, condition, or privilege of employment and that the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Johnson v. VT Halter Marine, Inc.*, 820 Fed. App'x 283 (5th Cir. 2020)(quoting *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012)).

73.    As stated above, Plaintiff engaged in a Title VII protected activity when she began to file complaints against Michael Armstead due to his harassing and discriminatory behavior. Every time Michael Armstead took further discriminatory action, whether it was denying a request for a reasonable accommodation, granting privileges to Plaintiff's colleagues without disabilities that he denied to Plaintiff, etc., she would add that information to her complaint.

74.     Also as stated above, A causal link exists between Plaintiff's report to Defendant regarding Michael Armstead's behavior toward her and the worsening of Michael Armstead's behavior. Plaintiff was so qualified for her position that she was even recommended to take over control of a specific drug program in 2020. In December 2020 Michael Armstead sent out an email outlining generalized duty branch responsibilities which gave Plaintiff the most responsibilities in her department. Once Plaintiff began to make requests for reasonable accommodations, including her 4-10 schedule and increased telework to accommodate her disabilities, Michael Armstead began to increasingly target Plaintiff including bringing her into his office to overly critique her performance, or take her into a public atrium for a performance review and chastise Plaintiff in front of all her passing colleagues, refuse to allow telework and instead require Plaintiff to take leave while at the same time granting telework to her colleagues, requiring Plaintiff to come into the office on days that she actually was approved for telework, filing a report accusing Plaintiff of going AWOL when she was not AWOL and he knew the circumstances, and sending unwelcomed text messages to Plaintiff outside of work.

75.     After Plaintiff began to file formal complaints against Michael Armstead documenting his discriminatory and hostile behavior toward her, Michael Armstead held Complainant's mid-year review, where he did nothing but criticize her, in a public atrium where no less than twenty people walked by and heard what was being said and saw Complainant crying. He took her out of his private office and into a place where she could be publicly humiliated. Michael Armstead knew this public humiliation would increase Complainant's anxiety and make matters worse.

76.     Michael Armstead has continually denied requests for Complainant to complete her work through telework instead of in-person while such requests from those without disabilities were accommodated. In fact, Michael Armstead told Plaintiff that telework was NEVER the answer for

that and instead that she needed to take leave. After Plaintiff began to file formal complaints against Michael Armstead documenting his discriminatory and hostile behavior toward her, instead of allowing telework prior to her surgery, he told her she had no choice but to use her leave. Even telework was supposedly never the answer, Michael Armstead allowed Plaintiff's colleague Michael Williams the privilege to telework when he had medical issues.

77.     As noted above, Plaintiff requested a 4-10 work schedule as a reasonable accommodation due to her mental disability. Michael Armstead and the EEO requested documentation from her doctor, which was provided on more than one occasion, to provide proof of the need for this accommodation. Plaintiff's doctor provided a scientific explanation of Plaintiff's injuries and that this would be a reasonable accommodation and more conducive to Plaintiff's health. The Medical Documentation Request Form submitted by Plaintiff's doctor on November 9, 2021 explains that "the request of dramatically changing her sleep pattern from working a day shit to working a night shift for a week out of every other month is detrimental to her ability to control and function on an alternative sleep schedule." Michael Armstead then took it upon himself to refuse the accommodation without any sound or reasonable explanation.

78.     These are all actions that were taken by Michael Armstead after Plaintiff began to document his discriminatory behavior with the EEO. They were aware of Michael Armstead's treatment of Plaintiff and they allowed it to continue and even empowered him to do so by supporting his denials for reasonable accommodations. Even if Plaintiff's concerns had only been documented in paperwork which could theoretically be overlooked, Plaintiff took the additional step to personally report this behavior to the EEO. On or about May 25, 2021, EEO Counselor Lynette Taylor contacted Plaintiff to set up a meeting to discuss her request for reasonable accommodation. In this exchange, Plaintiff let Lynette Taylor know that she felt she was being

harassed by Michael Armstead. No action was ever taken to either move Plaintiff to another supervisor or to stop Michael Armstead from discriminating against Plaintiff due to her disability.

79.     Defendant's actions clearly demonstrate that they knew Michael Armstead was creating a hostile work environment for Plaintiff and they failed to take any remedial action.

## CONDITIONS PRECEDENT

80.     All conditions precedent to jurisdiction have been complied with or have occurred: a charge of discrimination was filed with the Equal Employment Opportunity Commission within three-hundred days of the acts complained of herein and Plaintiff's Original Complaint is filed within ninety days of Plaintiff's receipt of the Equal Employment Opportunity Commission's issuance of a right to sue letter.

## DAMAGES

81.     Plaintiff incorporates all preceding paragraphs herein. As a direct and proximate result of the occurrence made the basis of this lawsuit and Defendant's acts as described herein, Plaintiff suffered damages including but not limited to the loss of income and earnings, attorney's fees, court costs, and other damages as described herein or as may be proven at the time of trial.

## ATTORNEY'S FEES

82.     Request is made for all costs and reasonable and necessary attorney's fees incurred by or on behalf of Plaintiff herein, including all fees necessary in the event of an appeal of this cause as provided by Rule 54 of the Federal Rules of Civil Procedure and 42 U.S.C. § 2000e-5(k).

## PRAYER

Plaintiff prays that citation be issued commanding Defendant to appear and answer herein and that Plaintiff be awarded judgment against Defendant for an amount within the jurisdiction limits, plus court costs and attorney's fees.

Plaintiff requests a jury trial, which fee will be attached.

Plaintiff prays that she be awarded a judgment against Defendant for reasonable attorney's fees and post-judgment interest.

Plaintiff prays for general relief.

Respectfully submitted,


*/s/ Ali Crocker Russell*
Ali Crocker Russell
State Bar No. 24098868
ali@cralawfirm.com
CROCKER RUSSELL & ASSOCIATES
2401 Callender Road, Suite 103
Mansfield, Texas 76063
Tel: (817) 482-6570
Fax: (682) 232-1850

**ATTORNEY FOR PLAINTIFF**